## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                                    Criminal No. 10-323  RHK/AJB

               Plaintiff,

v.                                                    **REPORT AND RECOMMENDATION**

(1)    Carlos Maurice Harris, and
(2)    Ronald Harold Moore,

               Defendants.

        Julie E. Allyn, Esq., and Steven L. Schleicher, Esq., Assistant United States
             Attorneys, for the plaintiff, United States of America;

        Caroline Durham, Esq., and Catherine L. Turner, Esq., for defendant Carlos
             Maurice Harris; and
        Andrew S. Birrell, Esq., for defendant Ronald Harold Moore.

        This action came on for hearing before the Court, Chief Magistrate Judge Arthur

J. Boylan, on February 14, 2011, at the U.S. Courthouse, 300 South Fourth Street, Minneapolis,

Minnesota  55415.  The Court issued an Order on Motions dated March 31, 2011, therein

reserving defendants' motions to suppress identification evidence, motions to suppress search

and seizure evidence, and motions to suppress statements, as well as a motions for severance, for

submission to the district court on report and recommendation.

        Based upon the file and documents contained therein, along with testimony of

witnesses and exhibits received at hearing, and the memorandums and arguments of counsel, the

magistrate judge makes the following:

**FINDINGS**

        A report of an armed robbery in progress at the Dunn Brothers coffee shop,

located in a building near the corner of Lake St. and Humboldt Ave. in the Uptown area of

Minneapolis, was received by the Minneapolis Police Department on the night of October 27,

2010. A police dispatch alert was promptly issued at 9:54 p.m., indicating that the robbery

involved two black males, one of whom was wearing a black hooded sweatshirt and jeans.

Multiple police patrol units were on duty in the neighborhood at the time and immediately

responded to the dispatch (Hrg. Ex. 10).[1]

    Minneapolis Police Officers Robert Illetschko and Adam Chard are assigned to

patrol the Uptown area and were dining at Williams Pub, two blocks from Dunn Brothers, when

the dispatch alert of a robbery in progress was issued. Officer Chard immediately proceeded to

Dunn Brothers on foot while Officer Illetschko proceeded by squad car, first heading south from

Williams Pub, based upon dispatch reports regarding the search for suspects. Shortly thereafter

the officers learned that suspects were in custody and they went directly to the coffee shop.

Officer Illetschko arrived at Dunn Brothers approximately five minutes after the initial dispatch,

and he obtained statements from two employee victims of the robbery, Ms. Hendrickson and Ms.

Oehrlein, within 15 minutes after the robbery. The victims stated that a man had come in

through the back door and ordered coffee a few minutes before closing time. Both employees

were standing behind the counter near the cash register when the man took out a handgun and

demanded money. He ordered one of the employees to the floor and told the second employee to

put money from the till into a black bag. The robber then hit Ms. Hendrickson on the head with

the handgun. The man asked whether there was any more money at the business and was told

that there was money in a safe in a rear room. He took both victims to the back room where the

---

[1] Hrg. Ex. 10 is a CD containing a recording of the initial dispatch alert and subsequent
radio transmissions by police officers involved in the immediate investigation.

safe was opened and more money was placed in the black bag.  The man ordered the employees to the floor and a second robbery suspect then entered the room.  The first suspect told the second suspect to tie the employees up, and he did so with a rope he had with him.  As the suspects were leaving and the victims lay on the floor, face down and tied up, one of the suspects walked on their backs and heads (Hrg. Ex. 5).[2]  Ms. Oehrlein stated that the initial robber was a black male and the second suspect who came into the back room had a larger body frame than the other suspect.  Ms. Hendrickson likewise stated that the first suspect was a black man and the second man had a larger frame, and she further stated that the second suspect was wearing shoes with a very distinctive yellow pattern on the soles.  Both employees indicated that they had conversed with the first suspect, had gotten a very good look at him, and could identify him.  Ms. Hendrickson also stated that she could identify the other suspect by his shoes.  The employee victims were visibly shaken and upset during their respective interviews with Officer Illetschko, and following these initial interviews the two victims were brought to an ambulance at the scene to tend to injuries.

   Officer Chard met with four customer witnesses and conducted interviews at the Dunn Brothers coffee shop approximately 15 minutes following the robbery.  One of the customers, Mr. Lund, stated that he became aware of the robbery when he observed one of the employees being ordered to open the cash drawer and to get on the ground.  He also saw the counter employees being forced into the back office area.  Lund indicated that he had stayed in the business, near the office door, and had seen one person robbing the front counter and two individuals leaving the office.  After the robbers left, Lund went into the office, found the

---

[2]  Hrg. Ex. 5 is a DVD store surveillance recording of the robbery in progress.

employees tied up with a green rope, and helped free them.  Mr. Lund stated that he had gotten a good look at the robbers and thought that he could identify both of them.  Following the interviews with Officer Chard, the customer witnesses participated in a show-up procedure.

**Arrests and Show-up Identifications**

       **Moore Arrest.**  Minneapolis Police Officer Jason Kiritschenko and his partner were on patrol in a marked squad car near Hennepin and Lagoon Ave., approximately two blocks from the robbery scene, when the dispatch was received.  The officers drove to the rear parking area of the Dunn Brothers shop, arriving in less than one minute, and without siren or flashing lights.  As they pulled into the lot off Humboldt Ave., Officer Kiritschenko observed a black male wearing blue jeans and a black hooded sweatshirt running from the back door of the coffee shop.  The man, subsequently identified as defendant Ronald Moore, was carrying a black messenger bag on a shoulder strap.  Officer Kiritschenko was seated on the passenger side of the patrol car and immediately got out of the squad and proceeded to pursue the man on foot.  During the chase the officer yelled "police" and ordered the man to stop, with his handgun drawn.  The pursuit proceeded northbound through the block to Lagoon Ave., and the suspect thereafter ran west on the sidewalk along Lagoon (Hrg. Ex. 8).  The chase continued as the man cut across a parking lot and jumped a fence to go south on Irving Ave.  The officer yelled at the man to stop at least three times before getting within five feet of him at a location near a church on Irving Ave.  The officer again ordered the man to stop, at which time he laid on the ground on a grass spot near Irving and Lake St.  The foot chase lasted from one-to-two minutes.  Officer Kiritschenko called for assistance, handcuffed the suspect, and pat searched him for weapons.  No gun was found in the pat search and the suspect no longer had the messenger bag with him.

In light of the report that the robbery was at gunpoint, and thinking that the gun might have been dumped and was a public safety concern, the officer asked where the gun was, in response to which the suspect stated that the other guy had it.  Officer Kiritschenko had not seen Moore drop the bag, but he had momentarily lost sight of the suspect as he was getting out of the squad car. Additional pat searching led to discovery of some keys and a small amount of cash.  After Mr. Moore was placed in a squad car that had arrived at Irving Ave., Kiritschenko retraced the chase route and found a black messenger bag that looked to be the same bag that Moore had earlier been carrying.  The satchel was found at a location near the beginning of the chase, before it proceeded on Lagoon Ave.  It contained cash and a black semi-automatic handgun.  The officer did not remove the bag or its contents from the location, but left it in place pending further crime lab investigation.  A canine unit had been called to assist, but the messenger bag was found before the canine arrived.

  **Harris Arrest.**  Meanwhile, the initial dispatch alert was also received by Minneapolis Police Officer Hillary Glasrud and Officer Lewis while they were on patrol in a marked squad car headed eastbound on Lake St., at the intersection of Lake and Irving.  The officers immediately parked their squad car at the corner of Lake and Irving, less than a block from the scene of the reported armed robbery, and walked towards the Lake St. entrance of the Dunn Brothers shop.  They were in front of the shop within a minute of the dispatch alert.  As she got close to the coffee shop Officer Glasrud observed someone sitting in the front window and she also saw a black male running very fast from the east side of the building.  The man was approximately six feet tall, with a heavy build and wearing dark clothes.  Officer Glasrud pursued the man as he ran across Humboldt Ave., then crossed Lake St. and proceeded down

Lake St. for half a block before turning south down Holmes Ave. As the man ran away he was taking off his hooded sweatshirt and was gaining ground on the officer. At that time another squad car, driven by Minneapolis Police Sgt. Donald Smulski, approached Lake St. from the south on Humboldt and saw the individual with a black hoodie rapidly running east on Lake St. Sgt. Smulski activated his siren and lights, proceeded eastbound on Lake St., and followed the suspect south down Holmes. Officer Glasrud continued the chase on foot and heard some yelling. She came upon Sgt. Smulski and the suspect in an alley off the east side of Holmes, approximately one half block from Lake St. Sgt. Smulski had not lost sight of the suspect and had seen him taking off the hoodie and throwing it on the top of a dumpster where it was found. Smulski had grabbed the suspect and brought him to the ground after the man had unsuccessfully attempted to scale a six-foot fence. He was forcibly handcuffed and subsequently identified as defendant Carlos Harris. Meanwhile, Minneapolis Police Officers Christopher Burns and Heather Ashoff arrived in a marked squad in response to the initial dispatch and subsequent radio report from Sgt. Smulski that a suspect had been chased and caught on Holmes. Just as they came upon the scene defendant Harris was being brought to the sidewalk area. Sgt. Smulski indicated that he had not done a thorough search and stated that a proper search of the suspect should be conducted. Officer Burns thereafter did a pat search for weapons before placing him in the rear of his squad car. A cell phone was found and seized in the pat search. Harris declined to be examined for a head injury by paramedics who had arrived at the scene. Sgt. Smulski instructed officers on the scene to conduct show-up identifications of the suspects, though another supervising sergeant on the scene had previously instructed that the suspects be transported to jail.

**Employee Victim Identifications.**  After being placed in the squad car, Harris was transported to the northwest corner of Lake St. and Holmes Ave., near the Bruegger's Bagel shop[3] for a show-up identification.  At the corner he was taken out of the squad car and made to put the discarded sweatshirt on and stand on the sidewalk in handcuffs.  Officer Glasrud stood about five feet away from him, and two-to-four other officers also stood nearby, while a show-up identification procedure took place with robbery victims separately observing Mr. Harris from an ambulance approximately ten feet away.  The area was well lit by street lighting.  The suspect was then walked down the sidewalk about a quarter of a block to the front of the Dunn Brothers shop where he was told to stand facing the business in front of a large window where he could be viewed by robbery witnesses from inside the shop.  Mr. Harris was still in handcuffs and Officer Glasrud stood three-to-five feet away from him, with additional officers nearby.  Lighting came mainly from the shop itself, but was not bright.  The show-ups were conducted approximately 15 to 20 minutes after Officer Burns took custody of Harris and about 45 minutes after the initial robbery dispatch.  Physical custody of defendant Harris was later transferred to Officers Illetschko and Chard.

While the two victims were together inside the rear end of the ambulance,[4] parked near the Humboldt/Lake St. intersection, Officer Illetschko told them that two people of interest had been stopped and that he wanted to conduct a field show-up for identification purposes.  For

---

[3] Dunn Brothers and Bruegger's Bagels are adjacent to one another on Lake Street.  The bagel shop in on the corner of Lake St. and Humboldt Ave. and Dunn Brothers is directly to the west.

[4] Before and during the show-ups, the victims were in the rear patient transport area of the van ambulance.  There is a distance of at least ten feet from the rear of the patient area to the front of the patient area.  There is a side door near the front of the patient area, and this door has a window that is approximately two feet by two feet in size.

7

the actual show-ups, Illetschko kept the victims separate and spoke to them individually and in a quiet tone to avoid allowing the other witness to overhear. Ms. Oehrlein was first brought to the front of the ambulance to view defendant Harris. The scene was lit by an outside light on the business and a side spotlight from the ambulance. Harris stood 10 to 15 feet from the ambulance window. Ms. Oehrlein stated that she had not seen his face, but that the person had a body type consistent with the second robber. She was then send to the back of the ambulance and Mr. Hendrickson came to the front. Hendrickson likewise stated that she did not get a good look at the second suspect, but she further indicated with absolute certainty that Harris was wearing the exact shoes, with distinctive bright yellow coloring, as the person who tied her up.

The ambulance and the employees were then driven approximately one-half block down Lake St. towards the Irving Ave. end of the block where defendant Ronald Moore was in custody. The suspect was standing on the sidewalk and officers were standing near him. There was street lighting as well as the ambulance spotlight and a squad spotlight on the suspect. Again, the employees were kept separate for the actual show-up procedure. Ms. Oehrlein made the first viewing from the front area of the ambulance and she positively identified the suspect with certainty and without hesitation. She was sent to the back while Ms. Hendrickson was brought to the front of the ambulance. Ms. Hendrickson immediately and without hesitation stated that the show-up subject, defendant Moore, was the man that had robbed the coffee shop and hit her with a gun. The Moore show-up took place approximately 45 minutes after the robbery had occurred.

**Witness Identifications.** Defendants Moore and Harris were separately brought to front of the Dunn Brothers shop where they each stood on the sidewalk and could be viewed

through a large front window.  Customers who had been interviewed by police remained inside

the coffee shop in the same room and were asked to participate in a show-up procedure.  Officer

Chard individually brought each customer witness to a spot about 20 feet away from the others

and told the witness that two people were in custody.  The witness then viewed the person

through the window and was asked whether the person was involved in the robbery.  Both

suspects were in handcuffs and were illuminated by spotlights and/or flashlights.  None of the

customers was able to make an absolute positive identification of defendant Harris.  With respect

to defendant Moore, Mr. Lund immediately stated "that's him" with certainty.  The other two

customers were unable to positively identify Moore.

**Search and Seizure**

Sgt. Smulski learned that a car key had been seized from defendant Moore and a

GM product key with a key fob was brought to him.  The Sgt. believed that the suspects might

have parked a car in the area so he first proceeded to walk up and down streets north of Lake St.

while pressing the key fob button to see whether any car lights were activated.  He then got into

his car and drove streets south of Lake with the key fob.  As he was returning to Lake on Irving

he noticed a white Cadillac parked in the mid-block with tires turned outward and the front end

facing southeast and farther out from the curb.  The lights on the Cadillac were activated when

he pushed the fob button.  Sgt. Smulski checked the vehicle to make sure it was not occupied.

He then ran a licence check and determined that the car was registered to Tonya Siemers from

Burnsville.  The vehicle was not reported stolen.  Smulski determined that the Cadillac was a

probable get-away car.  He therefore took photos of the car as it was parked.  He further decided

to impound the vehicle and proceeded to conduct an inventory search pursuant to Minneapolis

Police Department policy (Hrg. Ex. 15). Various items, including a wallet containing defendant

Moore's identification, were seized. Sgt. Smulski then instructed Officers Lopez and Atkins to

complete the inventory and impound procedures and arrange for towing.

**Statements**

        The morning of October 28, 2010, Minneapolis Police Sgt. Walter Carlson was

assigned to conduct interviews of defendants Carlos Harris and Ronald Moore. That same day

Sgt. Carlson met with Mr. Moore in an interview room on the fourth floor of the Hennepin

County Jail, at which time the defendant indicated that he did not want to speak to the

investigator. Sgt. Carlson also met with Mr. Harris at the fourth floor interview room and he

agreed to questioning. The room had chairs and a table and only Sgt. Carlson and Harris were

present. Sgt. Carlson first obtained personal biographical information and then read the <u>Miranda</u>

warning to the suspect. Harris acknowledged his rights and agreed to talk with the investigator

about the robbery. The defendant was not under the influence of alcohol or drugs during

questioning; he appeared able to understand his rights and his answers were appropriate and

responsive to questions presented to him; he did not appear to be experiencing ill-effects from

injuries to his head obtained during the previous night's chase (Hrg. Ex. 14). No promises,

threats, or coercive measures were taken to induce the defendant to provide statements.

Defendant Harris did not ask that questioning cease and he did not request the assistance of an

attorney. The interview was audio recorded and lasted 18 to 20 minutes (Hrg. Ex. 6).

        During the interview, defendant Harris stated he was talking to his girlfriend on

his cell phone at 10:00 p.m. on the previous evening, and that he wanted Sgt. Carlson to check

the phone to verify the conversation. The phone had been seized and was located in the police

property room.  Sgt. Carlson obtained the phone and reviewed the call list to obtain the

girlfriend's phone number.  Carlson called the number and contacted Tonya Siemers.  A white

Cadillac that was involved in the case was registered to Ms. Seimers and she stated that she

knew Mr. Harris and had given him permission to use the vehicle.  She also stated that she did

not know defendant Moore.  Sgt. Carlson also interviewed the employee victims and the

customer witness involved in the Dunn Brothers robbery, and reviewed a video surveillance

recording of the robbery (Hrg. Ex. 5).  He assigned search warrant drafting and preparation

responsibilities to Officer Nelson.  Carlson subsequently obtained buccal swabs from each

defendant pursuant to search warrants and he participated in the execution of warrants to search

a vehicle and take photos.

**Search Warrants**

     **Hennepin County Warrants.**  Several Minnesota state search warrants were

issued in the investigation in this matter.  The first warrant authorized a search of the Cadillac

that had been impounded on the night of the Dunn Brothers robbery, and a second warrant

authorized the taking of photographs and processing the vehicle for fingerprints.  State warrants

were also issued authorizing the recovery of a DNA sample from each defendant by way of

buccal swabs.  In addition, a federal warrant was obtained for the search of certain designated

cell phones.  The state search warrants were written by Minneapolis Police Officer Patricia

Nelson at the instruction of Sgt. Carlson.  Officer Nelson reviewed available police reports for

purposes of preparing the warrant applications and the applications were reviewed by Sgt.

Carlson prior to their presentation to a judge for consideration.

     Three separate search warrants were issued on November 1, 2010, by Hennepin

County District Court Judge Patricia Belois, authorizing the seizure of DNA evidence via buccal swab from defendant Ronald Moore (Hrg. Ex. 3) and defendant Carlos Harris (Hrg. Ex. 4); and search of a Cadillac automobile (Hrg. Ex. 1). The warrant to obtain photograph and fingerprint evidence from the Cadillac was issued on November 2, 2010 (Hrg. Ex 2). The four warrants were all based upon the applications and affidavits submitted by Minneapolis Police Officer Patricia Nelson. The buccal swab warrant applications were substantially the same in content with regard to the offense being investigated, though each provided additional evidence to establish the involvement of the respective defendant in the Dunn Brothers robbery. The Cadillac search warrants contained substantially the same content regarding the offense and the involvement of each defendant and further noted evidence that had been obtained by way of inventory search of the same vehicle. The November 2, 2010, warrant merely added the request for photo and fingerprint authorization.

Each buccal swab application and the respective warrant described the evidence to be seized as DNA of the particular defendant, via cheek/saliva swab or a blood draw if a cheek swab is refused. The place to be search is described as the person of the particular defendant. The description of items to be seized pursuant to the vehicle search warrants included handguns, ammunition, clothing used in robberies, drugs and drug paraphernalia, documents showing vehicle ownership and use, and evidence of past robberies. The second vehicle application and warrant included the request for authorization for seizure of photo and fingerprint evidence. The place to be searched was identified as a vehicle with a specified MN license plate number, further described as a 2003 white Cadillac Deville 4 door, registered to Tonya Karen Siemers. The affidavits of Minneapolis Police Officer Patricia Nelson stated

12

evidence and information intended to establish probable cause for issuance of each of the

warrants, including information obtained from police investigation reports regarding the Dunn

Brothers robbery which contained information and identification evidence provided by witnesses

to the offense, victims of the robbery, and officers involved in the immediate investigation.

Officer Nelson and Sgt. Carlson participated in the execution of each of the four state warrants.

**Federal Search Warrant.**   On December 30, 2010, United States Magistrate

Judge Janie S. Mayeron issued a warrant to search three cell phones that were each particularly

identified by serial number, including a Motorola cell phone seized from defendant Carlos

Harris, and two Nokia cell phones seized from the Cadillac  (Hrg. Ex. 7).  The search warrant

identified the objects of the warrant as any lists of names, telephone numbers, and addresses;

names of persons contacted; images and pictures sent and received; voice mail messages;

depictions of firearms; passwords; evidence of ownership and control; and other data to include

call history, images, internet history, calendar entries, recordings, and contraband and fruits of

firearms violations and robbery.  The warrant was issued on the basis of probable cause

contained in the Affidavit of ATF Special Agent David Carriker, including information relating

to the Dunn Brothers robbery and evidence obtained in the investigation of that robbery,

including statements by the defendants and criminal history evidence.

Based upon the foregoing Findings, the magistrate judge makes the following:

## CONCLUSIONS

<u>Severance</u>

**Severance.**  Severance of defendants is not required in this matter.  Defendant

Ronald Harold Moore moved for severance and for *in camera* examination of his co-defendant's

13

statements and defendant Carlos Harris moved for severance in his post-hearing memorandum. Co-defendant Harris' interview statements are in the hearing record as an exhibit and the motion for *in camera* review is therefore moot. Also, defendant Moore did not address the matter of severance, or the effect of co-defendant statements, in post-hearing memorandum. Fed. R. Crim. P. 8(a) permits joinder of offenses in the same indictment if the offenses are of the same or similar character or are based on the same act or transaction or are based on acts connected together or constituting parts of a common scheme or plan. The propriety of joinder under Rule 8(a) is a question of law, though relief from a legally permissible joinder may be obtained as an exercise of discretion on motion for severance due to prejudice, pursuant to Fed. R. Crim. P. 14. United States v. Rodgers, 732 F.2d 625, 628-29 (8th Cir. 1984). Availability of the Rule 14 remedy permits broad construction of Rule 8 in favor of initial joinder. Id. at 629. With respect to joinder of defendants in this instance, it has not been shown that severance of co-defendants is necessary to avoid risk of compromising any specific trial right to which each of them is entitled or is necessary to prevent the jury from making an unreliable judgment as to the guilt or innocence of each of them.

The individual co-defendants in this matter have been indicted on charges of aiding and abetting one another to interfere with commerce by robbery and aiding and abetting one another to possess a firearm in furtherance of a crime of violence. Two or more defendants may be charged in the same indictment if they are alleged to have participated in the same transaction or series of incidents constituting an offense or offenses. Fed. R. Crim. P. 8(b). "There is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro v. United States, 506 U.S. 534, 537, 113 S.Ct. 933, 937 (1993). Nonetheless,

14

the court may grant a severance of defendants if it appears that a defendant is prejudiced by a

joinder at trial.  Fed. R. Crim. P. 14.  A court "should grant a severance under Rule 14 only if

there is a serious risk that a joint trial would compromise a specific trial right of one of the

defendants, or prevent the jury from making a reliable judgment about guilt or innocence."

Zafiro, 506 U.S. at 539, 113 S.Ct. at 938.

        Defendant Moore generally asserts potential jury confusion, the spillover effect of

evidence relating to the other defendant, and the prejudicial effect of statements and evidence

that would otherwise be inadmissible.  He contends that a limiting instruction would not be

sufficient to avert jury confusion and prevent prejudice.   Moore does not describe grounds for

severance with significant factual particularity.  Defendant Harris makes the general assertions

that the jury will have insurmountable difficulty in distinguishing the acts of one defendant from

those of the other, and evidence may be introduced by one defendant that would be inadmissible

against the other defendant in a separate trial.

        The defendants in this case were properly joined under Rule 8 and there is no

requirement for severance based upon misjoinder.  Rule 14 severance is a remedy for prejudice

that may develop during trial, and the decision on a Rule 14 motion for severance lies within the

sound discretion of the trial court.  United States v. Robaina, 39 F.3d 858, 861 (8th Cir. 1994).

The record, including testimony produced at hearing, offers no compelling indication as to how

either defendant is prejudiced by joinder with the other the defendant in this case, particularly to

the extent necessary to overcome the preference for joinder of defendants.  Specifically, it is not

patently apparent that a jury would be unable to distinguish and apply the evidence relating to

one defendant from evidence relating to another defendant, and neither defendant has made a

persuasive particularized showing that a joined trial will prevent introduction of exculpatory evidence or will allow introduction of otherwise inadmissible evidence with respect to either defendant. Joinder of defendants in this case was not improper and severance is not required in light of the current record. See United States v. Wadena, 152 F.3d 831, 847-50 (8th Cir. 1998). The court further concludes that with the assistance of instructions from the trial court the jury will be fully able to distinguish the acts of each defendant from the acts of the other defendant so as to avoid prejudice. Severance is a remedy that can be provided at the time of trial if appropriate under the circumstances. At present, there has been no showing to support a recommendation for severance of defendants.

**Harris Arrest**

Defendant Carlos Harris' arrest was based upon sufficient evidence to establish probable cause to believe that he was directly involved in the Dunn Brothers robbery. Suppression of evidence obtained during the arrest, as well as evidence subsequently obtained through show-up procedures, interrogation, phone search, and other investigative procedures, is not required on grounds that such evidence is the fruit of an unlawful arrest. Defendant Harris argues that he was unlawfully pursued and arrested because he did not match the description of a suspect that had been transmitted to officers by dispatch, and because he was merely a black man running down a city block. Defendant substantially understates the nature and totality of the evidence relating to probable cause. The initial dispatch described a suspect as a "black male, 20-30 years old, five foot six inches, thin build, black hoodie and jeans." In contrast, Harris asserts that he is a larger, heavy-set person and is clearly taller than the reported suspect. The evidentiary recitation ignores additional facts, including Officer Glasrud's observation that

16

Harris was seen running from the immediate area of the reported robbery at a time that was wholly consistent the report of a burglary in progress. Another highly important factor was the observation by both Officer Glasrud and Officer Smulski of the suspect taking off his sweatshirt while running away from them. Furthermore, the inconsistency between defendant Harris' stature and the dispatch description of a suspect does not diminish the probable cause to any significant degree and his flight from pursuing police, though perhaps not dispositive as to probable cause, certainly contributes to the totality of evidence in this instance. The robbery was reported while in progress and police had responded in less than two minutes. Officers would have been foolhardy to assume that there would not be more than one suspect, and to exclude a potential suspect based upon particular physical characteristics which do not preclude involvement. Defendant Harris was not chased and arrested merely because he was a black man running down the block, and under the totality of circumstances, there was sufficient evidence to constitute probable cause for his arrest. Also, to the extent that defendant Harris seeks to suppress identification evidence, statements, and phone search evidence as fruit of an unlawful arrest, suppression is not required.

**Show-up Identifications**

        **Show-up Evidence.** Suppression of identification evidence relating to either defendant Carlos Harris or defendant Ronald Moore on grounds that a witness identification of the particular defendant was made pursuant to a constitutionally impermissible show-up procedure is not required. Each defendant was subjected to multiple show-ups in this matter. While the identification results of the various show-ups diverged, depending primarily upon the particular witness' experience and opportunity to observe suspects during the course of the

robbery, the methodology and circumstances of each show-up was substantially the same with respect to each customer-witness identification and each victim-witness identification.

Whether admission of identification evidence violates a defendant's right to due process is considered in light of the likelihood that the identification procedure could result in misidentification.  United States v. Pickar, 616 F.3d 821, 827 (8th Cir. 2010) (citing Neil v. Biggers, 409 U.S. 188, 198 (1972).  A crime witness' identification of a suspect is admissible unless it is the result of an identification procedure that is both impermissibly suggestive and unreliable.  Id. (citing United States v. Martinez, 462 F.3d 903, 910 (8th Cir. 2006)).  The identification is unreliable if its circumstances create a substantial likelihood of misidentification.  Id.  Relevant circumstances include the witness' opportunity to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of any prior description of the suspect by the witness, the level of certainty during the identification procedure, and the time elapsed between the crime and the identification.  Id. (citations omitted).

In their challenges to the crime scene identifications in this case both defendants argue that the procedures were rendered impermissibly suggestive under circumstances whereby witnesses observed multiple police officers immediately surrounding each of them, while they stood in handcuffs under the glare of spotlights.  However, in United States v. Pickar the court held that a show-up conducted under remarkably similar circumstances, with a handcuffed suspect standing between two officers in front of a marked squad, with one of the officers shining a flashlight on the suspect's face, were not subjected to an unduly suggestive identification by witnesses observing the suspect through a window from twenty to thirty feet away.  Id., 616 F.3d at 828 (distinguishing the facts from Clark v. Caspari, 274 F.3d 507, 509

(8th Cir. 2001), where defendants were forced to lie down on the pavement with a officer

standing over them with a shotgun).  In essence, a show-up procedure is inherently suggestive to

the extent that it establishes that "this is the person you should be observing,' and that the subject

is indeed a suspect, but is improper only when procedures strongly suggest guilt as well as

affirmative identification.  Neither defendant Carlos Harris nor defendant Ronald Moore were

subjected to show-up procedures that were unduly suggestive under the circumstances in the this

case.

        Furthermore, even assuming that the show-up identifications were unduly

suggestive, the court concludes that the identifications were not the product of circumstances that

would create a substantial likelihood of misidentification and are unreliable on that ground.

United States v. Jones, 535 F.3d 886, 891 (8th Cir. 2008)(citing United States v. Martinez, 462

F.3d 903, 910).  With respect to defendant Ronald Moore, positive identifications of his person

were made by both employee victims and a customer.  Each of those witnesses had opportunity

to view the suspect from a close distance at the time of the crime, such that the employees were

in immediate proximity to Moore and spoke with him, and the customer observed the robbery

taking place.  Moreover, each witness was able to view Mr. Moore within approximately 45

minutes after the robbery and with adequate lighting; his dress and appearance was consistent

with the initial report; and each of the witnesses was certain that the suspect was the person who

had committed the robbery.  Under the totality of circumstances the show-ups did not create a

substantial likelihood of irreparable misidentification. With regard to defendant Moore's

additional contention that show-up evidence should be suppressed because the initial on-site

investigation supervisor, Sgt. Schmidt, may have wanted to conduct identification procedures in

a different manner, and line-up procedures could have been conducted at the jail, the matter is of little constitutional consequence.  Whether a questionable identification procedure could have been avoided and another procedure used instead is an issue that goes to the weight of the evidence and is not a concern of constitutional dimension.  United States v. Hadley, 671 F.2d 1112, 1116 (8th Cir. 1982).[5]  As to customers who did not identify Moore, the motion is simply moot.

With respect to defendant Carlos Harris, neither the employee victims nor the customers made a positive identification of his person, and the motion to suppress identifications of Harris is therefore moot.  Nonetheless, Harris appears to argue that he was the subject of an irreparable mistaken identification which should be suppressed, apparently because an employee witness identified his shoes by their distinctive yellow sole pattern.  The court has determined that Mr. Harris was not unlawfully arrested.  The shoes were therefore lawfully seized incident to the arrest.  The evidentiary inferences that may be considered as to identification again go to the weight to be given the evidence and are not constitutionally significant.

**Vehicle Search**

Evidence seized from the white Cadillac that was impounded following the arrests of both defendants was obtained by way of lawful inventory search pursuant to policy, and the evidence was also lawfully seized pursuant to the automobile exception to the warrant requirement.  Suppression of the evidence is not required.  See United States v. Taylor, __ F.3d

---

[5]  Defendants cite United States v. Hadley, 671 F.2d 1112, 1115, for the proposition that show-ups are inherently suggestive and ordinarily cannot be condoned when a line-up procedure is readily available.  As further stated in Hadley, and discussed herein, the inherent suggestiveness of a show-up does not establish a due process violation.  Consideration of the reliability of line-up identification, either by presentation of a group photo array, sequential photo array, or a traditional police station line-up, is outside the scope of this decision.

__, 2011 WL 561979 (8th Cir.)   An inventory search is a search of lawfully seized and detained

property, conducted to ensure that the property is harmless, valuable items are not lost or stolen,

and to protect against false claims of loss or damage.   United States v. Mayfield, 161 F.3d 1143,

1145 (8th Cir. 1998) (citing South Dakota v. Opperman, 428 U.S. 364, 376, 96 S.Ct. 3092

(1976)).  This issue does not involve a motor vehicle stop.  Indeed, the car was parked and

defendants were not removed from the vehicle or observed getting out of it.  However, on the

basis of the arrests of defendants Harris and Moore, and the lawful seizure of car keys from

defendant Moore's person incident to his arrest, officers had probable cause to believe that the

defendants were using the vehicle and that it was being used to facilitate criminal activity.  Sgt.

Smulski therefore determined that the vehicle would be impounded and that an inventory search

would be conducted.  Considering the totality of circumstances the court finds no grounds on

which to invalidate the impoundment itself.

        Defendant Harris challenges the inventory search, asserting that a police policy on

inventory searches was not provided and no inventory receipt was created, and that failure to

follow department policy suggests that the search was conducted for purposes other than

impound inventory.  A vehicle inventory search must be reasonable under the totality of

circumstances and may not be a ruse for general rummaging to find incriminating evidence.  Id.

at *2.  The reasonableness requirement is met when the search is conducted pursuant to

standardized policy, thereby removing the inference that the search was for purposes of

discovering evidence of crime.  Id.  The Minneapolis Police Department written policy on

inventory searches was produced (Hrg. Ex. 15), and the policy states that items of value and

items that are removed from the vehicle shall be listed on the tow sheet.  In this case Sgt.

Smulski testified that he instructed other officers to fill out a tow inventory sheet, to include particular items that he had seized, but there is not documentary evidence that an inventory sheet was actually created.  Under these circumstances the standardized inventory policy was not followed and the government is not entitled to any inference that the search was for inventory purposes.  Taylor at *3.  Nonetheless, even when standardized procedures are not followed, a search is reasonable if it is not a pretext for an investigatory search.  In that regard, "'something else' must be present to suggest that the police were engaging in their criminal investigatory function, not their caretaking function, in searching the defendant's vehicle."  Id. (citing United States v. Rowland, 341 F.3d 774, 780-81 (8th Cir. 2003).  In this instance Sgt. Smulski acknowledged that he believed the Cadillac was likely a get-away car and should therefore be impounded, but there is no concrete evidence in the record compelling the court to conclude that he believed that contraband or evidence of the robbery would be found in the vehicle and that the inventory was a mere pretext for investigation.

Alternatively, the search of the Cadillac was permissible under the automobile exception to the warrant requirement which permits a warrantless search when there is probable cause to believe the vehicle contains evidence of illegal activity.  United States v. Blaylock, 535 F.3d 922, 926-27 (8th Cir. 2008).  This exception is justified by the easy mobility of automobiles as well as the reduced expectation of privacy associated with motor vehicles.  Id. at 926.  Probable cause existed in this instance as a result of the Cadillac's keys having been recovered from defendant Moore's person and the vehicle being parked near the scene of the crime and in a manner highly conducive to a quick departure.  Defendant Harris' motion to suppress evidence seized from the white Cadillac prior to towing should be denied.

**Statements**

Defendant Carlos Harris' interview statement on October 28, 2010, conducted in an interview room at the Hennepin County Jail by Sgt. Carlson, was lawfully obtained. Defendant was advised of his constitutional rights, and he acknowledged and voluntarily waived those rights, including the right to remain silent, the right to confer with counsel and to have an attorney present, the right to stop answering questions, and the right to appointed counsel. The defendant was not subjected to threats, coercion, or promises, and he was not under the influence of drugs or alcohol or experiencing any ill effects from a head injury. He did not request that questioning cease and did not request the assistance of an attorney during the course of the interview. Suppression of defendant Carlos Harris' October 28, 2010, statements is not required. Furthermore, Mr. Harris' statements were not the fruit of an unlawful arrest and suppression in not required on that account.

**Search Warrants**

**Cadillac and Photos.** Evidence seized pursuant to a warrant to search a specifically identified 2003 white Cadillac, located in Minneapolis, Minnesota. (Hrg. Ex. 1), as well as fingerprint and photographic evidence obtained pursuant to a second warrant to search the same vehicle (Hrg. Ex. 2), was not unlawfully obtained in violation of the constitutional rights of either defendant in this matter. The initial vehicle search warrant was issued on November 1, 2010, and the second warrant was issued on November 2, 2010. The two warrants were based upon sufficient probable cause evidence[6] as stated in the affidavits of Minneapolis

---

[6] The warrant affidavits state that the car keys and remote fob were seized from defendant Carlos Harris, but testimony at the hearing indicates that the keys and fob were found on defendant Ronald Moore. The court has found that the keys were recovered from Mr. Moore, but this evidence and the existence of a discrepancy is not material to probable cause in this

Police Officer Pat Nelson, and as determined by Hennepin County District Court Judge Patricia Belois. The applications were identical except that the second application requested additional authorization to take photographs and process the vehicle for fingerprints. The warrants properly and sufficiently identified the vehicle to be searched and the items to be seized. The search warrants in this matter were lawfully issued and there is no requirement for suppression of evidence seized pursuant to the warrants.

**DNA Search Warrants.** Evidence seized pursuant to separate warrants to seize DNA samples from the person of Ronald Harold Moore (Hrg. Ex. 3), and the person of Carlos Maurice Harris (Hrg. Ex. 4), was not unlawfully obtained in violation of the constitutional rights of either defendant. The warrants were issued on November 1, 2010, and each warrant was based upon sufficient probable cause relating to the particular subject as stated in an individualized Affidavit of Minneapolis Police Officer Pat Nelson and as determined by Hennepin County District Court Judge Patricia Belois. Each of the warrants properly and sufficiently identified the person and the subject of the seizure and stated a nexus between the object of the warrant and an alleged felony offense. The DNA search warrants in this matter were lawfully issued and there is no requirement for suppression of DNA evidence seized pursuant to the warrant.

**Cell Phones.** On December 30, 2010, United States Magistrate Judge Janie S. Mayeron issued a warrant authorizing searches of three particularly identified cell phones, one of which was recovered from defendant Carlos Harris' person, and the remaining two having been

---

instance.

seized from a specifically identified Cadillac (Hrg. Ex. 7). The cell phones were in police

custody in evidence storage in the Minneapolis Police Department property and evidence room.

The search warrant described the objects of the warrant as data and information electronically

stored within the cellular phones, particularly identified as any list of names, phone numbers and

addresses; names of persons contacted; images and photos; text messages; voice mail messages;

depictions of firearms; passwords; evidence of phone ownership and control; and additional data

to include call history, images, internet history, calendar entries, recordings, and

instrumentalities of firearms offenses. The warrant was issued on the basis of probable cause

contained in the Affidavit of ATF Special Agent David Carriker, including investigation

evidence and the description of offenses contained in police reports, and information obtained in

discussions with law enforcement officers.

      **Good Faith.** The DNA and vehicle search warrants issued by Hennepin County

District Court Judge Patricia Belois on November 1, 2010, and November 2, 2010, as well as the

cell phone search warrant issued by the United States Magistrate Judge on December 30, 2010,

were executed by officers having a objective good faith reliance on the validity of each of the

warrants, and the searches were lawful. As to any individual warrant application there is no

evidence that the issuing judge was intentionally or recklessly misled by false information in an

affidavit; there is no suggestion that the judicial role was completely abandoned by the issuing

judge; the indicia of probable cause in the affidavit is not insignificant; and the particular warrant

is not facially deficient. United States v. Hessman, 369 F.3d 1016, 1020 (2004)(citing United

States v. Leon, 468 U.S. 897, 923, 104 S.Ct. 3405 (1984). The search warrants in this matter

were lawfully issued and executed and there is no requirement for suppression of evidence

seized pursuant to the warrants.

Based upon the foregoing Findings and Conclusions, the magistrate judge makes the following:

## RECOMMENDATION

It is hereby recommended that:

1. Defendant Ronald Harold Moore's Motion for Severance and for <u>in camera</u> Review of Co-defendant's Statements be **denied**  [Docket No. 34];

2. Defendant Carlos Maurice Harris' Motion to Suppress Eyewitness Identifications be **denied** [Docket No. 49];

3. Defendant Carlos Maurice Harris' Motion to Suppress Evidence Obtained as a Result of Search and Seizure be **denied** [Docket No. 55];

4. Defendant Carlos Maurice Harris' Motion to Suppress Statements, Admissions, and Answers be **denied** [Docket No. 56];

5. Defendant Ronald Harold Moore's Motion for Suppression of Eyewitness Evidence be **denied** [Docket No. 43];

6. Defendant Ronald Harold Moore's Motion for Suppression of Evidence Obtained by Search and Seizure be **denied** [Docket No. 44];

7. Defendant Ronald Harold Moore's Motion for Suppression of Statements be **denied** [Docket No. 45]; and

8. Defendant Carlos Maurice Harris' memorandum motion for severance of defendants be **denied** [Docket No. 75].

Dated:  ___April 8, 2011___

    <u>  s/Arthur J. Boylan                              </u>
Arthur J. Boylan
United States Chief Magistrate Judge


       Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before April 22, 2011.

       Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and file a complete transcript of the hearing within ten days of receipt of the Report.